Ms. Chan, whenever you're ready. Case 13-1322, Tide Plastic Bags v. U.S. Thank you. May it please the Court, I'm Irene Chan appearing on behalf of the appellant, TPBI. As we demonstrated in our brief, the Department of Commerce's margin calculation is neither supported by substantial evidence, nor in accordance with law. Does Tide Plastic Bags maintain records of actual labor and overhead costs? They do, but according to my understanding, it's based on a three-month moving average, so it was not recorded in a condom-specific manner, in the manner that Commerce had asked for in the question. I saw something saying that that was consistent with the Tide accounting standards, but it seems to me any normal accounting standard would require something on a monthly basis. Well, I'm not that familiar with the Tide Gap, the General Accounting Principles of Thailand, but apparently it was in accordance with Thailand General Accounting Principles. And it is not unusual for respondents to have a set of books and records that don't contain the specific accounting methodology that Commerce requires. No, no, that's not unusual, but just that rolling average is unusual. I haven't seen it before. The issue revolves around Commerce's construction of a home market value for TPBI. Commerce's recalculation of the per unit direct labor variable and fixed overhead costs of each of TPBI's products, by weight averaging those costs evenly across all of TPBI's products, including non-subject products, was not supported by substantial evidence and was contrary to the statute. Now, according to Commerce, this was done to eliminate cost differences not tied to physical differences in the subject merchandise. What proof did TPBI submit to support its claim that Commerce's reallocation methodology introduced more distortions in the cost of production in the ultimate calculation? Well, during the administrative review, they submitted two sets of cost allocations. One was based on machine time and the other was based on production time. So the set of costs based on machine time was essentially the amount of time the machine had to take to produce the bag. That's in your brain. Yes, yes. So, in essence, TPBI argued in the review that they had a whole set of bags, not just t-shirt bags that were exactly alike. They had bags with different candles, gussets, reinforcements, colors, and they also had non-subject bags, bags that were not covered by the review, garbage bags, drawstring bags, individually folded bags. So TPBI argued to Commerce, look, if you take all of our conversion costs, the fixed, the variable, and our labor costs, and you spread them evenly across all of these products, you're essentially introducing more distortions. You're taking higher overhead costs that were used to make those non-subject bags and inflating the other bags that are covered by the review. And that takes us to what polyethylene retail carrier bag committee argues in its brief that TPBI has varied its reallocation from review to review in what they call a transparently results-oriented manner. How do you respond to that? Well, we would submit that that is not correct. In the prior review, the record was not the same, and TPBI was actively trying to work with Commerce to get the correct allocation or an allocation that would reasonably reflect its production costs. And my understanding was in the prior review, the same record information was not for Commerce as it was in this review. And so TPBI contacted the Commerce analysts and said, you know, we're trying to work with you. We're submitting the machine costs, the labor costs, the production costs. Let us know what can we do to assist in getting the correct or reasonable reflection of their actual production costs. And so it is not correct. It's not true that TPBI is attempting to do this in a results-oriented manner. What percentage of TPBI's costs were direct materials? Were direct materials? Unfortunately, I'm not quite clear. I don't know that answer exactly. The government says the vast majority, they refer to it as the vast majority of the costs were for direct materials. Do you disagree with that? Well, not knowing the exact number, I would probably disagree with that because Because you don't know it's true? Yes, because I don't know it's true. You don't know it's false? I don't know it's false. I don't know it's true. But the bottom line is that this reallocation did affect the margin calculation. It did, and it affected it materially. Because if you're taking costs from products that you're not reviewing, that you're not calculating margin for, higher cost bags, and you're taking those costs and spreading them out among T-shirt bags that are alike. When I say T-shirt bags, I mean the bags you can find in grocery stores. Those bags, and not alike, you're basically inflating the cost of production, and in turn inflating the constructed value and the normal value that you would use to compare to the U.S. price, and this inflates the margin. So let's assume commerce was right in rejecting your cost methodology, and what is your position on what would be the better alternative for commerce to have done based on the data that was available besides what they ended up doing? That they go back and adopt the machine and the production costs that were reported by TPBI. Is there a third way? That's what I'm wondering. Well, that was what we were discussing in our briefs, is that commerce in the past has looked at the entire record. So say you had a product mix that contained large production quantities, and another product mix that had low quantities of production. Commerce has gone in to actually make adjustments to that, and that is what we argued in the condoms heirs that they said that showed a lot of discrepancies, even though those products were very much alike. TPBI pointed out to commerce that, look, there were different production batches. One was much higher in quantity than the other. So commerce could have gone in and just made adjustments to those non-condom sets. What was the difference in production numbers? I don't think I remember seeing that in the briefs. Essentially, the way the condoms were reported was TPBI ran batches of bags. So commerce was looking for TPBI to report their costs and their prices per batch, essentially. So you had one batch that was a certain color type of t-shirt bag, but there was a much higher production quantity within that batch. Another batch under a different condom that may have been a similar bag, but lower number of bags. So commerce's claim or their conclusion was, well, why is this batch so much higher in these overhead costs in the second batch? And TPBI pointed out that, well, you had a much higher production quantity in this batch. So as a result, you had a lower unit value. What were the numbers, I guess? The production numbers. You're saying, oh, this one's higher than that one. Well, if you don't give me numbers, I don't know. Well, that's BPI, but essentially it's like taking 100 bags and 10 bags. 100 bags in one batch and 10 bags in the second batch. So what commerce has done in the past is they've evened out. They've taken those production quantities and basically added them together and then divided it by the overhead for those bags. I'm stating in prior cases and other cases where they've looked at the actual production costs, what would be a reasonable reflection of actual production costs. For example, in Japan hot rolled, they took the four different sets of product mixes and they made adjustments because initially the respondent had just reported overhead costs based on one product mix. So commerce went in and made adjustments in order to get all the information from all four product mixes. So in this case, commerce, instead of looking more deeply into the record, decided, well, we see these discrepancies, so we're just going to average out all of TPBI's conversion overhead costs across all products, subject and non-subject merchandise. Was there a meaningful way where they could have carved out certain merchandise from that calculation? Yes, I believe so, and it has done that in the past with many other cases because the statute, the standard is a reasonable reflection of actual production costs. I was wondering if the data was available such that it was chopped up, you know, bag by bag, product by product. The record is extremely detailed. It is by bag, by product. There's a very extensive record for commerce, and it could have done that, but it decided instead let's just take the totality, the total number of conversion costs, and just evenly smooth it out over all of TPBI's products, including products that were not covered by the order. So you can see that it played in. Commerce tried to deal with that by using DFMR, right? Well, yes, but DFMR is used in a different context. DFMR is not intended to apply to a situation where you're trying to build a value, a normal value. They've used DFMR before, right? DFMR is for... They've used it before, right? They used it after they... With TPBI, they've used it before, right? They used it in the prior review, I believe. Right. Did you appeal that? We were not... I was not involved in that case. Or maybe you were satisfied with that. No, I was not TPBI's counsel. No, I'm talking about TPBI. Oh, TPBI, yes. I'm not sure why they didn't appeal it. But in essence, DFMR is used after the foreign-like product's normal value has been calculated to construct... to come up with an apples-to-apples comparison between the foreign-like product and the U.S. product. There are physical differences that may distort the ultimate margin comparison. So that's where DFMR is used. And we would submit that that use, that application of DFMR was flawed. There's a fundamental flaw here, and that is, how does commerce know what cost differences among physically different products should be? It's a very superficial test. You could find a bag that may look physically similar, but two bags, one and the second, may be physically similar, but the second bag requires much more processing. You're cutting into your rebuttal time now, so why don't we hear from the government and we'll reserve what you have left. Thank you. All right, we're starting with you, Mr. Majerus. Yes, Your Honor. Okay. May it please the Court, this case presents a single issue. Did the trial court correctly sustain commerce's rejection of the appellant's allocation methodology, which resulted in similar products with vastly different cost characteristics? And I'd first stress that physical characteristics is not something new, something commerce has relied upon for a long time, certainly as far back as the 1996 preamble to the proposed rules, which is 61 Federal Register 7308. And I would also note that in footnote one of the appellant's reply brief, there was a note that the language we had quoted was not from the preamble, but actually it was. And what that language states is that commerce conducts the low-cost test and allocates costs by comparing the physical characteristics of the columns. And the reason why it does that is because, as the preamble states, technology generally accounts for significant differences in actual costs. And in this instance, the appellant proposed an allocation methodology. It's important to keep in mind that the way they keep their books and records is a total amount of allocation costs, or a total amount of costs that are not allocated, basically a monthly average that's kept on a three-month rolling basis. So that's what we had to work with. We have this total allocation cost. The appellant provided their alternative allocation methodology, which is based on production times. There's two allocation methodologies, one based on production output and the other based on machine times. In response to that, commerce, after reviewing the record, found that there were pairs of columns that, while very similar, in some instances a percentage of color concentrate was the only difference. And I would also note that eight of the nine column pairs discussed were produced at the same facility. So commerce noted that these had widely different conversion costs and went back to the appellant and asked, can you explain this? The appellant did provide an explanation. They argued that it was due to a whole host of factors, production efficiencies, production quantity factory efficiencies, whether it was produced offline or online, etc. They provided the qualitative explanation, but there's nothing quantitative in the record. Based on what was provided in the data, it's not possible to extract how these various qualitative factors that the appellant has raised, how they would explain the difference in costs. And because of that, commerce did what it's done in many prior reviews. It weight averaged the total allocation costs. So are you saying production volume and machine time are irrelevant to the inquiry? No, that's not what we're saying. You're just saying there was a failure of proof to support those themes for why the cost methodology should depend on those two elements. Precisely. In effect, you're using the best information available. Right. They provided qualitative reasons, but there wasn't the quantitative data to support it. And this is something that's been done in prior reviews. As I mentioned, the preamble stresses that the physical characteristics is a standard that the commerce has applied in the past. But also in several reviews, there's three in particular that are cited in the briefs. Japan, hot rolled steel, steel bar from the United Kingdom, and Brazil pipe. Now these all dealt with slightly different circumstances, but essentially you had an allocation methodology proposed by the party, the respondent. Commerce found that it generally did not explain that there were differences in conversion costs despite similarities in physical characteristics. And commerce then did what it was able to do given the data and essentially reallocated on a per unit basis. Now the appellant noted in Japan, hot rolled steel, that commerce was able to, when they did the reallocation, that they were able to do it in a product group basis. But the distinction is in that case, that data was there to do that. In our case, we don't have that data. Commerce just had this total conversion cost. Yeah, was there something that commerce could have done to divide out, carve out some of the categories of merchandise which were far afield from the merchandise we're supposed to focus on? Unfortunately, no, based on the data that was provided. And really the burden is on the appellant to provide the data that creates this universe of home market costs. And based on the data that they provided, commerce determined that the only approach it could take was to reallocate weight average on a per unit basis across all of the product lines. And the reason why commerce did this and has done this in prior reviews is that it's not perfect. It doesn't completely reflect actual costs, but it minimizes the distortions. Help me out with one more thing. I'm new to this world, your world. And DfMR seems to contemplate certain calculations being done in one context with respect to price. And now I'm reading all of this about commerce using this statute in a different context for cost. So a guy like me, I read that and say, what's going on here? It's a fair question. It's a different, although it can be similar in some respects, the different analysis is a bit different. So the appellant provides this universe of home market costs. And, of course, the purpose of this is to compare. Is it commerce's reading that the statute applies in both contexts? Well, once that universe of costs is determined, and in this case in particular, the below cost test is very important, in that if costs were in excess of the price sold in the home market, then you kick those costs out if they hit a certain percentage. Or are you just borrowing from the principles that are already expressed in DfMR and applying them in this context because they seem to work here? Well, the reason I mention the below cost test is once you have that universe of the home market sales, then you compare them to the U.S. sales. And that's where DfMR comes in. And DfMR essentially says that if there are differences in costs once you're comparing those models, the condom models, if there's differences based on physical characteristics, commerce can make adjustments to the home market price. So it affects price. So the reason why it's helpful here is that the DfMR statutes state clearly that commerce, if they're going to make this DfMR adjustment to the home market price, it's got to be based on physical characteristics. Now, that analysis doesn't apply directly here because the focus is on the below cost test, but it's analogous. And the same costs were used in both analyses. Does that answer your question? I think so. I would just stress that commerce has used a test based on physical characteristics for quite a while. And the reason why is it's consistent. It's predictable. It can be administered across other investigations, administrative reviews. It's a dependable and measurable means of comparing two products sold in different markets. Commerce, in its preliminary calculation memo, stressed that physical characteristics is a primary factor in their analysis. Now, in some reviews, it's not the only factor. In U.S. Steel, that was a very different circumstance where commerce accepted the allocation methodology proposed by the respondent after doing a verification and determining that it was a conservative calculation. That was not based on physical characteristics, but the difference is in U.S. Steel, the Court of International Trade found that there was evidence to support the allocation methodology proposed by the parties. Here, that evidence isn't there. One of the things that disturbs me is the statute says that commerce isn't required to accept any reported cost. It's required to accept cost if they're based on records that are in accord with generally accepted accounting principles. In this case, the methodology proposed by Thai Plastic Bags doesn't even seem to me to be in accord with its own accounting methods, let alone any gap, if it exists. Right, and the statute you're referring to, 1677B, that certainly could be a problem. The major problem is normally you do refer to the records provided by the appellant, except, as Your Honor noted, if it's not in compliance with GAAP, but then also it has to reasonably reflect the costs associated with the production and sale of the merchandise. Based on the data we have here, on the quantitative data, that's just not shown. I would also stress that in addition to that provision, the statute also says that commerce must consider all evidence on the proper allocation of costs. If such allocations have historically been used by the exporter. Here, commerce did use the data historically used by the exporter, that total allocation cost amount that's kept on a monthly basis. The allocation that the appellant has proposed is not what they use in their books and records, and that's the distinction. And finally, I would note 19 CFR section 351.407 subpart C. It notes several factors that commerce can take into account, but it doesn't have to. Commerce is not bound to take a particular approach, and there's a presumptive assumption that the approach commerce has taken is correct, and there needs to be showing that it's unreasonable. That's, of course, the Thai pineapple case from this Court. Does this Court have any additional questions? No. Thank you very much. All right. Why don't we hear briefly then from Mr. Schneiderman. Do you have anything to add? Thank you. May it please the Court. I'd like to start by addressing Judge Wallach's question about Thai Plastics' accounting system. They have essentially two systems. They have a financial accounting system, which keeps overall costs for a period which is audited and becomes part of the financial statements. They also have another system called the job order accounting system, which is an internal cost-discounting system that they use for internal management purposes, such as setting prices, other business purposes. This is the system that you were referring to that uses the three-month rolling average, and it actually does have product-specific costs that they use for internal purposes. But in that job order accounting system, they actually use the weighted average conversion costs across all products. In other words, for internal business purposes, they don't make distinctions between conversion costs for this product versus that product. So when they set prices for business purposes, they don't recognize any differences among these products for conversion costs. What they did here in terms of trying to develop this methodology based on machine time, this was just for purposes of the dumping response. This is not something they do in the ordinary course of business. So when you talk about the statute, yes, the statute does require normally that you start with their own accounting records that they keep in the ordinary course of business. That's not what they did here. They did start with their job order system for most aspects, but they said, look, we're going to depart from the job order system because we want to report to you different conversion costs for different products, so we're going to come up with something completely different. Well, my question was, at the end, that my take is that it wasn't in accord with their own accounting principles. That's correct. It was not in accordance with their own, at least their own accounting system. Now, that doesn't necessarily make it improper, and Commerce could have the discretion to accept it if it finds it valid, but the statute doesn't require them to do so. Now, the statute says you start with their total actual cost, which they did in this case. They used the financial accounting system. And then Commerce has a lot of discretion to decide what's a proper allocation. The second sentence of the statute says proper allocation, and Commerce has discretion to interpret that phrase and determine what factors should drive a proper allocation, and their historic practice has been the differences in physical characteristics have to drive that allocation. So the first point is that they didn't start with their own, they're departing from their own financial accounting system. The second is that even if they had maintained product-specific conversion costs in their ordinary books and records, which they didn't, but even if they had, it would have been distorted and Commerce would have been correct in rejecting it because differences in, they use processing times here to allocate costs, and differences in processing times are not related to physical characteristics. In other words, if you compare two columns or control numbers, you have almost identical control numbers that have very different conversion costs and very different processing times, but it's not because one product is inherently much more time-consuming or difficult to produce. The reason why you see these differences, and we use the example in our brief, just blue bags and green bags, which inherently should require the same amount of time to process, is that management makes an election. They say, well, are we going to make this particular product as our older, less efficient facility, our newer, more efficient facility? Are we going to run this particular batch continuously in a very large quantity, or are we going to sort of split it up into many small batches? Depending on how they decide to do that, it could have very high or low per-unit processing times. That's what's driving cost differences here. It's not like, you know, in the steel cases, in the NuCan case that we cited, flat-rolled steel could have very different costs. A thin-gauge steel could require much longer to roll down than a thick gauge of steel. In fact, in NuCan, commerce faulted the respondent for failing to account for differences in rolling times between the different gauges of steel. But this case is sort of the opposite, which is that all these products really take about the same amount. There's nothing inherently different about these bags that cause one to have to incur higher conversion costs than the other. It's just the way that they've elected to do it. So it's not... You're just talking about the condom pairs. You're not talking about their whole portfolio of bags that they're making, right? Well, it's illustrated in those condom pairs, but it's really driven... Their methodology drives the entire database because they've used processing times for every product. And so the reason we looked at those particular condom pairs was because we wanted to look at products that are virtually identical, except for maybe one small difference. And what you would expect to see is that conversion costs should be about the same for those products. The fact that they're not told us that there's something going on, there's something strange, and that's when we started digging into this and found out that, well, in fact, what's driving differences is sort of internal management decisions about how to structure their priorities, not inherent differences in the physical characteristics of the product. And commerce has been very consistent. It's required by the regulations and the different regulations, which is that differences among products have to be driven by physical characteristics. And getting to Judge Chen's question, there's no problem in using those, borrowing those principles in that context of cost of production because we're trying to compare a price for a product to a cost for that same product. The price of that product's going to be driven by those specific physical characteristics, and so you want to make sure that the cost that you're comparing it to has those same physical characteristics. One final thought. And just again, the statute allows this because it uses the phrase proper allocation. It doesn't say what factors commerce must use, so they're certainly free to use physical characteristics. Thank you. Thank you. We have a couple minutes left. Yes, thank you. To Judge Wallach's question about TIGAP, there was no issue on the record that TIGAP plastic bags, books and records were not compliant with their home market accounting principles, or that there were any credibility issues, or that those records were not audited. So we would submit that that issue is not really applicable here. What is applicable is back to what commerce's overarching obligation is. What issue is not applicable here? The issue that some... 1677BF1A. Well, the statute says that the cost should normally be based on TIGAP plastic bags, books and records, if those books and records are kept in accordance with home market, generally accepted accounting principles. And in the final results, commerce stated that TIGAP plastic bags cost methodology were based on their actual books and records, and commerce also said that its own methodology was, quote, as much based on TPBI's books and records as the methodology advocated by TPBI. And that was in the Issues and Decisions memorandum on page 13. So we would submit that any question about TIGAP plastic bags, books and records, whether or not they were compliant with Thailand's generally accepted accounting principles, that that is not an issue that commerce has here. What is the issue is commerce's overarching obligation is to calculate dumping margins as accurately as possible. The government suggested that somehow TPBI could not submit the proper or submit sufficient data to achieve a reallocation, and that's just simply not the case. TPBI submitted all of the data, and all the data is available on the record. Otherwise, commerce would not be able to calculate its own margin or come up with its own reallocation. The data there... Is it correct that the bags that were sold in the United States were run in large batches while the domestic bags were made in small interrupted batches? Yes, that's my understanding that they ran larger batches for the exports to the U.S. market. So your time machine allocation methodology artificially shifts conversion costs between the models sold in the U.S. and those sold domestically. Well, in this case, commerce is just building the home market or the normal value cost. But what they could have done here, as they've done in prior cases, is to account for that. They could have taken the production quantities of the U.S. bound bags and the Thai bound bags and made an adjustment for production quantities there to ensure that each unit would be attributed the correct amount of conversion costs, the correct amount of overhead. The government and PCRB committee is saying that, well, there were discrepancies observed in the condoms, but that was only a very small subset. Nine condom pairs out of over 100. So taking that small subset, finding those discrepancies and reallocating it across the board has just introduced more distortion. And commerce is obligated and required to find a reasonable reflection of actual production costs, not to make every product conform to the exact same processing costs. That has introduced more distortions and commerce has not explained how its reallocation was less distorted. They simply make a blanket statement that that is the case. Thank you. Thank you. Thank both parties. The case is submitted.